```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
                            NORTHERN DISTRICT

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA       :
                              :
     v.                        :    Criminal No. 21-CR-0146-DKC
                              :
LIANG LIANG ZENG, et. al       :
                              :
          Defendant.           :    Baltimore, Maryland
                              :
- - - - - - - - - - - - - - - x    November 17, 2021
```

**DETENTION HEARING**


     BEFORE:  THE MAGISTRATE JUDGE J. MARK COULSON

```
APPEARANCES:                    CHRISTINA A. HOFFMAN, ESQ.
                                Office of the U.S. Attorney
                                36 S. Charles, Suite 400
                                Greenbelt, Maryland  20770
                                  On Behalf of the Government

                                MICHAEL D. WALSH, ESQ.
                                Demidchik Law Firm
                                150 South Wacker Street
                                Suite 3000
                                Chicago, Illinois  60606
                                  On Behalf of the Defendant

                                WILLIAM C. BRENNAN, JR. ESQ.
                                Brennan McKenna &
                                Lawlor, Chartered
                                6305 Ivy Lane, Suite 700
                                Greenbelt,  Maryland  20770
                                  On Behalf of the Defendant
```

Proceeding recorded by electronic sound recording,
transcript produced by transcription service.

ALSO PRESENT:
Ying Villaflor, Certified Mandarin Interpreter
Nikki Martin, Pre-Trial Services

Audio Operator:               Yasmine Kelly


Transcription Company:        CompuScribe
                              P.O. Box 789
                              Cheltenham, Maryland  20623-9998

# <u>I N D E X</u>

|  | <u>Page</u> |
|---|---|
| Preliminary Matters | 3 |
| Comments by Christina A. Hoffman, Esq. On Behalf of the Government | 6 |
| Comments by Michael D. Walsh, Esq. On behalf of the Defendant | 14 |
| Rebuttal by Christina A. Hoffman, Esq. | 18 |
| Decision of the Court | 22 |

KEYNOTE:  "---" Indicates inaudible in transcript.
          "*" Indicates phonetic spelling in transcript.

bek                                                                    4

1                        P R O C E E D I N G S

2         (Whereupon, at 11:37 a.m., the hearing began.)

3              THE CLERK:  This Honorable Court now resumes in

4    session.  The Honorable J. Mark Coulson presiding.

5              THE COURT:  Good morning.  Swear the interpreter,

6    please.

7              THE CLERK:  Would you raise your right hand?

8         (Whereupon, the interpreter was sworn.)

9              THE INTERPRETER:  I do.

10             THE CLERK:  Please state your name for the record.

11             THE INTERPRETER:  Ying Villaflor.

12             THE CLERK:  Thank you.

13             THE COURT:  Thank you.  Please call the case,

14   Ms. Hoffman.

15             MS. HOFFMAN:  Good morning, Your Honor.  This is

16   the United States versus Liang Liang Zeng, Case Number DKC-

17   21-0146.  I am Christina Hoffman, on behalf of the

18   Government, and we are here for a detention review hearing.

19             THE COURT:  All right, thank you.  We have got Mr.

20   Walsh and

21   Mr. Brennan.

22             MR.          :  --- --

23             THE COURT:  Oh, I am sorry, but let's let the

24   interpreter interpret.  All right.

25             THE INTERPRETER:  Thank you, Your Honor.

1              THE COURT:  All right, thank you.

2              Mr. Walsh or Mr. Brennan?

3              MR. WALSH:  Yes, I am Michael Walsh, Your Honor.  I

4    believe Mr. Brennan was kind enough to file my *pro hac vice*

5    motion.  So, that needs to be resolved at some point ---.

6         (Whereupon, a phone rings.)

7              MR.       :  Sorry.

8              THE COURT:  So, Mr. Walsh, your screen is frozen.

9              MS. HOFFMAN:  Mr. Walsh did mention that he was

10   having some internet difficulties this morning at his hotel.

11   Hopefully, this resolves quickly.

12             THE COURT:  We will give Mr. Walsh a moment to try

13   to reconnect.

14             MS. HOFFMAN:  Thank you.

15        (Long pause.)

16             THE COURT:  Mr. Walsh, you are back?

17             MR. WALSH:  Yes, I don't know what happened.

18   Candidly, I am --- several matters for this afternoon, and my

19   internet has been going in and out.  I had had repair people

20   up here.  So, I am on my phone now.

21             THE COURT:  All right.

22             Ms. Hoffman, is the Government still seeking to

23   have Mr. Zeng detained in this matter?

24             MS. HOFFMAN:  Yes, Your Honor.  Do we need to

25   resolve the *pro hac vice* first, or should I begin?

1          MR. BRENNAN:  I filed that motion yesterday, Your

2    Honor.  So, I think it ready to be -- no, I assume it is

3    ready to be granted, Your Honor.  I filed it yesterday.  I

4    would hope that the Court would sign that order, so.

5          THE COURT:  So, let me do this.  I will grant it

6    now, although I will go back and review in more detail, but I

7    will grant it, certainly, for purposes of this hearing.  If

8    there is any issue, I will alert the parties but I don't

9    anticipate one.

10          MR. BRENNAN:  Thank you, Your Honor.

11          THE COURT:  Ms. Hoffman, I would hear from the

12   Government first.

13          MS. HOFFMAN:  Thank you, Your Honor.  The

14   Government agrees with the conclusion of Judge Cho in the

15   Eastern District of New York that there is no condition or

16   combination of conditions that can reasonably assure that the

17   Defendant will appear in court, and will not continue the

18   fraud scheme, or engage in other obstructive conduct.

19          Mr. Zeng is charged with one count of conspiracy to

20   commit wire fraud, one count of actual wire fraud, and one

21   count of access device fraud.  There is also a forfeiture

22   allegation against Mr. Zeng, seeking forfeiture of property

23   traceable to the fraud, including a money judgement of over

24   $1 million.

25          And with that, I will turn to the factors laid out

1    in § 3142(g).  First, the nature and circumstances of the

2    offense charged.  The indictment stems from an investigation

3    by the Treasury Inspector General for the Tax Administration,

4    or TIGTA, as well as HSI and MST, into a fraud scheme

5    involving Target gift cards.

6            Now, it is important to know about Target gift

7    cards is that you don't need the actual physical card in

8    order to redeem the card for value.  You just need the number

9    and access code on the back of the card.  This fraud scheme

10   involved two phases.

11           In phase one, --- of the Defendant would contact

12   victim via phone or email and convince them that they owed

13   some kind of debt.  Often, they would falsely claim to be

14   from the IRS and tell the victim that they had an outstanding

15   tax liability, or another ruse like that.

16           Victims would be told that in order to resolve the

17   debt, they had to purchase Target gift cards in high dollar

18   amounts, often hundreds or even thousands of dollars.  And

19   once they have purchased the gifts, they would be told to

20   read the card numbers and access codes over the phone to the

21   fraudsters.

22           In phase two of the scheme, the fraudsters would

23   transfer the fraudulently obtained card numbers to

24   conspirators, who we will call runners, and the runners would

25   then quickly redeem the cards for items of value.  Usually,

1   high end electronic products like Apple iPads or Apple

2   watches.  And when I say quickly, they would usually do this

3   within an hour or two, before the victims had a chance to

4   realize they had been defrauded and canceled the cards.

5       Often, the runners would spend the day going from

6   Target store to Target store, in states across the

7   Northeastern seaboard; Maryland, Delaware, Virginia, New

8   Jersey, New York, redeeming fraudulently obtained cards.

9   Sometimes, you might have one runner redeem a portion of one

10  card in a Target store in Maryland, and then another runner

11  would redeem the remainder of the card in a different Target

12  store in New Jersey.  And then, ultimately, the runners would

13  ship the products they purchased to buyers overseas, in

14  places like China and Hong Kong, in exchange for money that

15  was wired to their foreign bank accounts.

16      So, this was a sophisticated scheme.  The four

17  Defendants in this indictment were phase two of the fraud

18  scheme.  They were the runners who redeemed the fraudulently

19  obtained gift cards, and shipped the products abroad.  And

20  the Defendant here, Mr. Zeng, was the ringleader of these

21  four Defendants.

22      So, not only did he personally redeem fraudulently

23  obtained Target gift cards, but he also coordinated the

24  activities of the other three.  He would provide them with

25  gift card numbers, or tell them how to obtain gift card

1   numbers, advise them of what products to purchase, and also,

2   at times, pay them for their services.

3           I want to talk about some of the facts specific to

4   this Defendant that show that he is a serious risk of flight.

5   On March 6th of 2020, TIGTA investigators, with MST, executed

6   a search warrant at the home of one of the Defendants' co-

7   conspirators, Yong Chen, at 510 Academy Avenue, in Owings

8   Mills, Maryland.  They recovered boxes of high-end Apple

9   electronic products, Target bags, Target receipts, Target

10  gift cards, and handwritten legers with gift card numbers and

11  dollar amounts.

12          They also seized a cell phone belonging to Yong

13  Chen that was found to contain WeChat messages, in which he

14  discussed the fraud scheme with others, including the

15  Defendant.  In the messages, Chen and the Defendant exchanged

16  fraudulently obtained Target gift card numbers, discussed

17  purchasing Apple products, and also exchanged information

18  regarding the transfer of funds out of the country into a

19  Chinese bank account.

20          State felony charges were brought against the co-

21  conspirator, Yong Chen, as a result of the search warrant.

22  At the time, the Defendant was living in Maryland, at a home

23  he owned at 202 Cherry Valley Road, and his home was under

24  surveillance by law enforcement.

25          In the days following the search warrant at the co-

1   conspirator's home, the Defendant began to throw out various

2   items connected to the conspiracy.  So, the search warrant

3   happened March 6th, and on March 10th, agents did a trash

4   pull at the Defendant's residence.  And in the trash pull

5   they recovered 48 Target gift cards, Target receipts, another

6   handwritten leger with gift card numbers and dollar amounts,

7   and the Defendant's fingerprints were recovered from some of

8   these items that were linked to fraud victims.

9        And then, within two weeks of the search warrant at

10   the co-conspirator's home, the Defendant, Mr. Zeng, suddenly

11   left the District of Maryland, moved out of his home, took

12   his vehicles, and relocated to a home in Staten Island, New

13   York, where there is evidence that he continued the fraud

14   scheme.  For instance, twice in April of 2021, TIGTA

15   conducted trash pulls at Mr. Zeng's residence in Staten

16   Island and recovered additional Target store gift card

17   receipts bearing his fingerprints.

18        On July 13th of 2021, TIGTA investigators executed

19   at search warrant at Zeng's Staten Island residence, which

20   was at 409 Barlett Avenue.  Law enforcement knocked

21   unannounced several times and called out the Defendant's

22   name.  Ultimately, they had to breach the door when no one

23   answered.

24        They did not have a Mandarin interpreter, but after

25   making entry they spoke to the Defendant's wife, who did

1   speak English.  She initially would not tell law enforcement

2   where the Defendant was, and only after repeatedly being

3   asked did she say, finally, that he was upstairs.  Finally,

4   they found the Defendant hiding the closet of a bedroom on

5   the second floor.

6        During a search of the residence, they recovered

7   $43,633, in cash, some of which was tied up in Target bags.

8   And they also found brand-new sealed electronic products,

9   Target store gift cards, and Target receipts.  Also, inside

10  of the Defendant's wallet they found a receipt for a $10,000

11  ATM deposit into a JP Morgan Chase account with over $240,000

12  in it.

13        Subsequent investigation into the bank account

14  revealed that it is owned by two individuals in Staten

15  Island, and it has received two $39,000 wire transfers from

16  the Bank of China.  We suspect that these are proceeds of the

17  fraud scheme.  Unfortunately, in July 2021, just before

18  execution of the search warrant, a withdrawal of over

19  $200,000 was conducted from the account.

20        Turning to the second factor, the weight of the

21  evidence here is very strong.  It includes transaction

22  records from Target, and photo and video evidence of the

23  Defendant redeeming fraudulently obtained gift cards at

24  Target stores.  They also included the WeChat messages in

25  which the Defendant discussed the fraud scheme, with his co-

bek                                                                      12

1   conspirators, and it includes the Defendant's fingerprints on

2   various materials associated with the conspiracy.

3           It also includes the fruits of the search warrants

4   in Maryland and New York, where agents recovered Target bags

5   full of high-end Apple products, Target gift cards, legers,

6   et cetera.  And it the testimony of victims who were often

7   elderly or infirmed, and who lost significant sums of money

8   and suffered great financial and emotional distress as a

9   result of the fraud.

10          Moving to the third and fourth factors, the

11  Defendant's criminal history and characteristics, and the

12  nature and seriousness of the danger.  Mr. Zeng does not have

13  any known criminal convictions, but there are other factors

14  that weigh in favor of detention here.

15          First of all, this is the type of fraud scheme that

16  the Defendant could easily continue while on home detention,

17  with access to a computer or a cell phone.  There is evidence

18  that he built up a network of runners who could continue to

19  assist him with carrying out the scheme.

20          There is also a serious risk of flight.  Mr. Zeng

21  is a Chinese national, with a brand new Chinese passport that

22  he just renewed in June of 2021, and he has traveled to China

23  in the recent past.  According to ICE, he last traveled to

24  China from February to March of 2018.  And notably, when he

25  was arrested, he told Pre-trial Services that he had not

13

1     traveled abroad since 2016.  And that wasn't true, and we

2     think that raises an alarm, that he provided false

3     information to an officer of the Court.

4          Mr. Zeng is facing a substantial penalty, if

5     convicted.  The total maximum penalty is 20 years on Counts 1

6     and 2, and 15 years on Count 6.  The Advisory Guidelines

7     Range, without a plea, is also high, roughly seven to eight

8     years.

9          So, there is a significant incentive to flee, and

10    Mr. Zeng also has financial means.  Not only does he have

11    significant assets, with homes in New York and Maryland,

12    there is also the bulk cash found in his New York home,

13    vehicles, like a Mercedes Benz, and evidence that he has

14    access to large sums of money in bank accounts in other

15    people's names, as well as access to funds maintained in

16    foreign bank accounts.  And that also doesn't match up with

17    he told Pre-trial Services when he was arrested, which was

18    that he has been unemployed and receiving unemployment checks

19    since March 2020.

20         Considering Mr. Zeng's evasive conduct when he left

21    the District after the warrant was executed at his co-

22    conspirator's house, his status as a foreign national, the

23    interstate nature of his network, and the overseas bank and

24    ---, we think there are [sic] no conditions or combination of

25    conditions that can reasonably assure that he won't flee or

1    engage in further obstructive conduct.

2            For all of these reasons, we recommend that the

3    Court reach the same conclusion that Judge Cho did, and

4    continue to detain Mr. Zeng pending trial.  And I would like

5    to reserve the ability to respond to Mr. Walsh's arguments

6    regarding the proposed guarantor and third-party custodian.

7            THE COURT:  Thank you, Ms. Hoffman.

8            Mr. Walsh?

9            MR. WALSH:  Yes, thank you, Your Honor.  I

10   apologize again for my internet issues today.  I don't know

11   what is going on with it, but I am on my phone.  So,

12   hopefully, you are able to hear me well.

13           THE COURT:  I am.

14           MR. WALSH:  We have filed a motion that I am sure

15   the Court has had an opportunity to look at.  Pardon me.  And

16   I would just want to go through some of the background of Mr.

17   Zeng for the Court's benefit, and why he is not a risk to

18   flee, why the Court should consider allowing him to be ---

19   with certain conditions.

20           THE INTERPRETER:  Excuse me.

21           MR. WALSH:  Mr. Zeng, in regards to his Chinese

22   citizenship, the Government has already seized his passport.

23   So, he would not be able to use that for travel purposes.  He

24   was a past resident of this jurisdiction.  The residence that

25   he lived at is still owned by he and family members.  It is

1    presently rented.

2              The residence of his in Staten Island is owned by

3    he and his brother-in-law.  He has been a legal permanent

4    resident of the U.S. for about 10 --- as his wife and his

5    children are U.S. citizens.  Prior to COVID, he was working

6    in restaurants.  And unfortunately, as was the case for many

7    restaurant employees throughout the U.S., he lost his job

8    when COVID impact adversely on theses businesses.

9              His uncle, named Jiam, J-i-a-m, Dong, D-o-n-g, is a

10   resident of Maryland.  He owns his residence in Baltimore.

11   And he is willing to act as a guarantor for Mr. Zeng's bail.

12   I would also note that Mr. Dong owns two restaurants in

13   Baltimore, and the other in Annapolis, where Mr. Dong advised

14   that Mr. Zeng would be able to work, if he were released.

15             And if the Court were to require Mr. Zeng to remain

16   in the jurisdiction, Mr. Dong has indicated his willingness

17   to provide Mr. Zeng with a residence with him.  Certain

18   documents confirming this information has been filed, under

19   seal, because there were some records there that were a

20   personal nature and need to be included on the record.  So,

21   that is why they were filed, under seal, and --- advised

22   Mr. Dong.

23             He has a stable living arrangement here in the

24   state of New York, which is not far from Maryland, and his

25   family are all living nearby him.  Any travel could easily be

1   limited to this jurisdiction and the Southern District of New

2   York, but we are inclined to allow him to be released on

3   bail.

4           I would note as to some of the facts --- the case,

5   especially the circumstances surrounding his arrest; I have

6   met with his wife on multiple occasions.  She does not speak

7   English well at all.  And I would note from the Pre-trial

8   Services Report, --- through the --- Service representative

9   without an interpreter being present.  And when I have spoken

10  to her, I --- interpreter.

11          THE INTERPRETER:  Mr. Walsh, you ---.  Say it

12  again, Mr. Walsh.

13          MR. WALSH:  I am sorry, can you hear me?

14          THE COURT:  Yes.

15          THE INTERPRETER:  Yes, right now ---.

16          MR. WALSH:  I would note that when I speak with his

17  wife, she always has an -- well, I always have an interpreter

18  with me.  There were concerns -- all right, can you hear me?

19          THE COURT:  Yes.

20          MR. WALSH:  That is okay, because it is kind of

21  breaking up.  I apologize.  The circumstances also with his

22  arrest, the family believed that these agents may have been

23  trying to break into his house, as --- for lack of a better

24  term, a burglar.  And that is the circumstances why he was in

25  a position where he was located.

1          I would certainly acknowledge that the facts that

2   the Government have presented seem to suggest that it has a

3   strong case, and I am not going to address those issues at

4   this time.  Merely to say that I believe that there are

5   sufficient conditions that can be put in place here to ensure

6   that Mr. Zeng will return to Court, and can go back and help

7   raise his two young children, and work to earn income.  And

8   with that, I would rest on the argument in favor of him being

9   released.

10          THE COURT:  Mr. Walsh, do I understand that the

11   proposed release plan would be the pledging of Mr. Dong's

12   residence as security?

13          MR. WALSH:  He has indicated his willingness to do

14   that.

15          THE COURT:  Is there also a willingness to also

16   pledge Mr. Zeng's two residences, one in Maryland, and one in

17   Staten Island?

18          MR. WALSH:  Yes, Your Honor.  I would note that the

19   two properties have co-owners on each; brother-in-law was

20   Staten Island.  His wife and his parents would be Maryland

21   property.

22          THE COURT:  Mr. Walsh, can you give the Court some

23   semblance of the equity present in the three properties?

24          MR. WALSH:  Judge, I am going to -- if you will

25   give me a moment just to open up an email here.  That is the

1    prior -- the Pre-trial Report has some notes there, and

2    referenced those for the Court's benefit.  Judge, the

3    Maryland residence's value at the time this report was

4    prepared appeared to be about $270,000, with a $210,000

5    mortgage.

6              The Staten Island residence, obviously, because of

7    it being close proximity to New York City, was about

8    $730,000, with a $500,000 mortgage.  At the present time, I

9    don't have the value of Mr. Dong, the uncle's -- what equity

10   is in that property.

11             THE COURT:  Thank you, Mr. Walsh.

12             MR. WALSH:  Thank you, Your Honor?

13             THE COURT:  Ms. Hoffman?

14             MS. HOFFMAN:  Thank you.  I did want to respond,

15   briefly, about properties and proposed guarantor.  There are,

16   as Mr. Walsh acknowledges, mortgages on both the Staten

17   Island and the Reisterstown residences.  To be clear, Staten

18   Island is 409 Bartlett Avenue.  Reisterstown is the 202

19   Cherry Valley Road property.

20             THE INTERPRETER:  Cherry?

21             MS. HOFFMAN:  Cherry Valley Road.

22             THE INTERPRETER:  Cherry Valley Road.  Thank you.

23             MS. HOFFMAN:  The Reisterstown house, at 202 Cherry

24   Valley Road, is co-owned by four different people, and is

25   currently being rented out to an unrelated third-party.  The

1  Staten Island house, at 409 Bartlett Avenue, is owned by

2  Mr. Zeng's brother-in-law, Hong Fei Chen*.  Mr. Zeng is only

3  listed as the guarantor.  And as Mr. Walsh acknowledged,

4  there is only about 230,000 in equity in the home.

5         In addition, there are some irregularities in the

6  purchase of the property.  Loan records show that Mr. Zeng

7  and his wife gifted Hong Fei Chen roughly $150,000 towards

8  the purchase of the home.  And shortly before that, Mr. Zeng

9  had received several very large international transfers into

10 his Bank of America account.  Two of them were for 39,900

11 each, total close to $80,000.

12        So, this is at least consistent with Mr. Zeng

13 receiving fraud proceeds from international buyers, and

14 laundering money through his brother-in-law's purchase of the

15 home.  We also know that Mr. Zeng carried out that fraud

16 scheme while living at both properties; the 202 Cherry Valley

17 Road, and then at 409 Bartlett Avenue.  So, these properties

18 are very bound up with the fraud scheme.

19        I did also want to address the Yama Sushi

20 Restaurant owned by the uncle, where Mr. Zeng would

21 purportedly have a job.  Maryland wage records show that

22 Mr. Zeng reported wages earned at Yama Sushi Restaurant from

23 quarters three of 2018, through quarter three of 2020.  But

24 they were not wages that could support his lifestyle.  It was

25 an average of about $1,500, per month, and he was making much

1   more of that through the fraud scheme.

2           For instance, in August 2018, the Defendant and his

3   father and co-conspirator, Wen Fu Zeng, submitted a joint

4   loan application for a Mercedes Benz SUV.  And the Defendant

5   listed himself as the manager, and his father was listed as

6   the owner of the Fuji Yama Sushi Restaurant.  The Defendant

7   claims he made 6,500 per month, Wen Fu Zeng claims he made

8   8,300 per month.  But the wage records show they were making

9   a tiny fraction of that from the restaurant business.

10          Maryland wage records also show that the father and

11  co-Defendant, Wen Fu Zeng, also worked at Yama Sushi

12  Restaurant, from quarter four of 2018, through quarter three

13  of 2020.  But in reality --

14          THE INTERPRETER:  --- --

15          MS. HOFFMAN:  Oh, sorry.

16          THE INTERPRETER:  Thank you.

17          MS. HOFFMAN:  In reality, TIGTA had a tracker on

18  his vehicle, from roughly December 2019, through March 2020,

19  and his vehicle never went to Yama Sushi Restaurant during

20  that time period.  So, it is consistent with the Defendants

21  using the sushi restaurants as -- basically, as a cover for

22  the fraud scheme, making it seem as though they were earning

23  legitimate income, when in fact, the vast majority was coming

24  from illegitimate means.

25          And finally, with respect to the uncle's Maryland

bek                                                                      21

1    property at Baywood -- I believe it is Baywood Avenue, I

2    believe that that property may be currently rented out to a

3    third-party.  So, I am not sure whether the uncle is

4    proposing that that would be the residence where Mr. Zeng

5    would live, or whether it would be a different residence in

6    Maryland.  But regardless, we think that these properties are

7    too bound up with the fraud scheme to serve as legitimate

8    collateral, or to serve as places where Mr. Zeng should live

9    and work upon release.

10            THE COURT:  Thank you, Ms. Hoffman.

11            Ms. Martin, does Pre-trial Services have a

12   recommendation in the case?

13            MS. MARTIN:  We would still recommend that the

14   Defendant be ordered detained, based on risk of flight.

15            THE COURT:  All right.  Thank you, Ms. Martin.

16            Mr. Walsh, anything else from the defense?

17            MR. WALSH:  No, judge.  I am going to rest on what

18   we have argued.  I won't respond to Ms. Hoffman's further

19   comments.

20            THE COURT:  All right, thank you.  Well, Mr. Walsh,

21   let me ask you this question.

22            MR. WALSH:  Go ahead, sir --

23            THE COURT:  Through our interpreter.

24            THE INTERPRETER:  I am sorry, Your Honor.

25            MR. WALSH:  And judge, I apologize for

1   mispronouncing Ms. Hoffman's name.  I have a Christina

2   Hoffman, who is a prosecutor here in Chicago.  So, I just got

3   confused there a little bit.  So, I apologize.

4            MS. HOFFMAN:  No problem.

5            THE COURT:  My question is a follow-up to what

6   Ms. Hoffman asked, which was -- which is, what would the

7   proposed residence be, in Maryland, if the Court were to

8   consider release here in Maryland?

9            MR. WALSH:  So, the only thing I can relay to you

10  is what I was told by Mr. Dong, that he would reside with him

11  at that property that is listed in the motion, and the

12  documents are attached as an exhibit.  Mr. Dong did not

13  relate to me that that property had been -- is leased or

14  under any type of rental agreement presently.

15           THE COURT:  Thank you, Mr. Walsh.  Upon hearing the

16  presentations today, the Court shares Judge Cho's concerns

17  about flight risk in the case.  The Defendant is a Chinese

18  national with significant ties to China and financial

19  resources and in China.  It is true that his passport has

20  been confiscated, but the Court is very familiar with the

21  ability to obtain substitute or fraudulent passports if

22  significant resources -- financial resources are available.

23           The question for the Court is whether conditions

24  can be fashioned to reasonably control for flight risk.  The

25  issue for the Court is that there are several properties that

1   have been proposed, but the ownership status is somewhat

2   complicated.  Government has presented evidence that at least

3   two of the three properties could well have some relationship

4   to the fraud.  Also, the combined equity of those two

5   properties is not so significant as to give the Court

6   assurances that they themselves would provide adequate reason

7   not to flee.

8            As another example, there was evidence collected at

9   Defendant's residence of access to a brokerage account with a

10  quarter of a million dollars in it, at one time.  And that

11  amount alone, without even considering other foreign

12  accounts, begins to approximate the equity in the two

13  properties owned in part by the Defendant.

14           We also have evidence from the Government that the

15  fraud was both sophisticated and far reaching, that Defendant

16  had a significant role in coordinating the fraud, and that

17  the fraud had international aspects connected to China as

18  well.  This network for the fraud could also be easily

19  replicated by Defendant.  Even access to a cell phone might

20  well be enough to revive the fraud in some other locations,

21  coordinated by Defendant.

22           So, for those reasons, I am going to detain the

23  Defendant, pending his trial in the case.  I would remind you

24  however, Mr. Walsh, that my decision is appealable to the

25  District judge assigned to the case.  And should you wish to

1    pursue that avenue, that should be coordinated with Judge

2    Chasanow's chambers.

3         (Simultaneous discussion.)

4              THE COURT:  Anything else then this afternoon,

5    Ms. Hoffman?

6              MS. HOFFMAN:  No, thank you, Your Honor.

7              THE COURT:  Mr. Walsh, anything else from the

8    defense?

9              MR. WALSH:  No, sir.

10             THE COURT:  Thank you, everyone.

11             THE CLERK:  This Honorable Court now stands in

12   recess as to this matter.

13             MR.          :  Thank you.

14             MS. HOFFMAN:  Thank you.

15             THE INTERPRETER:  Thank you.

16        (Whereupon, at 12:41 p.m., the hearing concluded.)

17

18

19

20

21

22

23

24

25

bek                                                                          25

<u>C E R T I F I C A T E</u>

I certify that the foregoing is correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.

_Brenda C. Khan_   _02-10-22_

_____
Brenda Khan              Date